# In the United States District Court
## for the District of Utah, Central Division

| | |
|---|---|
| UNITED STATES OF AMERICA, | **REPORT AND RECOMMENDATION** |
| Plaintiff, | Case No.  2:07-cr-371 |
| vs. | |
| DANNY DUTTON, | Judge David Sam |
| Defendant. | Magistrate Judge Brooke C. Wells |

Danny Dutton ("Defendant") was indicted by the Grand Jury for possession of a firearm by a previously convicted felon, under 18 U.S.C. 922(g)(1).  Before the Court is Defendant's motion to allow a jury instruction for justification.  An evidentiary hearing was held on November 29, and 30, 2007, with final arguments presented on February 13, 2008.[1]

While Defendant was visiting a friend's home on May 7, 2007, police officers conducted a search of the friend's home.  During the course of the search, officers searched Defendant and found a gun on his person.  Defendant was on probation with the state of Utah at the time after having been convicted of a felony.  Defendant was found to be in illegal possession of the firearm and was subsequently arrested.

---

[1] On March 3, 2008, the Court received the transcript from final arguments and took Defendant's motion under advisement.

## BACKGROUND

At some point prior to March 24, 2007, Defendant alleges that he loaned $500.00 to a woman named, Ms. Lucinda Corral. The terms of the loan required that Ms. Corral pay Defendant $600.00 the following week.[2]  At one point, Ms. Corral informed Defendant that she had absolutely no intention of ever paying him back.[3]  Testimony at the evidentiary hearings included evidence that on March 24, 2007, Ms. Corral went to Defendant's home accompanied by Juan Gonzales and Aaron Barbosa.[4]  There, Barbosa confronted Defendant and began to attack Defendant while Gonzales and Ms. Corral waited outside.  Testimony was also given indicating that during the altercation in the home, Defendant was struck with a steel bar, breaking his arm.[5]  Defendant then reached for his gun and, armed with the gun, Defendant shot and killed Barbosa in what was later determined to be self-defense.[6]  Alarmed, Gonzales and Ms. Corral fled the scene and neither party has directly contacted Defendant or law enforcement since.

In the weeks following the March 24 incident, Defendant's family took precautions to ensure Defendant's and their own safety.  Defendant's mother Sheila Dutton, two of his brothers-in-law Kevin Thomas and William Billings, his ex-wife Bree Dutton and his mother-in-law Karen Senecal each testified that they had some concern as to what may happen to

---

[2] Tr. 1 at 18.

[3] Tr. 1 at 19.

[4] Tr. 1 at  11.

[5] Tr. 1 at 14, 17.

[6] Tr. 1 at 16.

2

Defendant or themselves personally.  In the weeks following the incident, the Defendant's family

were clearly worried about their safety.  Defendant's mother testified that she and a neighbor

witnessed an unknown individual suspiciously drive past the house a few times on one particular

day.[7]

Bree Dutton, testified that she personally received more than one phone call

threatening her and her son's safety.[8] Based on the anonymous callers' cryptic and worrying

comments during the short phone calls, she testified that the callers had a score to settle with

Defendant, and may inflict harm on her and  their son.[9]  In April of 2007, Bree testified that she

contacted Defendant about one of the phone calls, however, during much of the rest of the

relevant time period between late-March and early-May 2007, the two were living many miles

apart, and speaking little.[10]  Bree did not speak with Defendant about the calls at any point in

May 2007.

Following the March 24 incident, local law enforcement contacted Defendant and

his family about the investigation.  Defendant's family members testified they were told by

police that Ms. Corral & Mr. Gonzalez were possibly linked to a gang[11] and that Barbosa's

brother was about to be released from federal prison.  Hurricane City Deputy Chief Shane

---

[7] Tr. 1 at 152.

[8] Tr. 2 at 26.

[9] Tr. 2 at 27.

[10] Tr. 2 at 28.

[11] Tr. 1 at 95, 126.

Copeland informed Defendant that he was still a restricted person and could not legally possess a firearm.[12]  Copeland offered this warning on two occasions, once immediately following the incident on March 24, and again the following day.[13]  Members of the Hurricane City Police Department told Defendant's parents to be vigilant around the home,[14] and Deputy Chief Copeland specifically advised them to make sure that Defendant remained at home until they could further investigate.[15] Sheila Dutton testified that she and members of the Defendant's family applied for concealed weapon permits and took shooting lessons.[16]

Copeland and other local law enforcement kept in contact with the Dutton family during the weeks immediately following the March 24 incident and informed the entire police department that the Duttons' safety was a high priority.[17]  The Dutton family communicated the information to Defendant.  However after further investigation, local law enforcement determined that Defendant's assailants were not affiliated with any gang, and they did not pose as great of a threat of retaliation as the police had initially believed.[18]  Chief Lynn Excell testified that the Hurricane City Police Department never received any credible threat toward Defendant.[19]

[12] Tr. 1 at 62.

[13] Tr. 1 at 63.

[14] Tr. 1 at 96.

[15] Tr. 1 at 60.

[16] Tr. 1 at 141.

[17] Tr. 1 at 29, 105.

[18] Tr. 1 at 102.

[19] Tr. 1 at 98.

Over a month and a half later, on May 7, 2007, in an unrelated incident, officers from Adult Probation and Parole ("AP&P") conducted a routine field visit at probationer Ricky Wayne Jensen's residence in Hurricane, Utah.[20]

Testimony by Deputy Chief Copeland on November 29 indicated that while the probation officers searched Jensen's home, Defendant arrived for a visit with his friend, Mr. Jensen.[21]   Defendant worked for Jensen occasionally at Jensen's home. Officers searched Defendant as he arrived at the home on that date–May 7–and found a firearm in his right pants' pocket.  Because of Defendant's status as a restricted person, he was arrested for possessing a firearm.

According to Deputy Chief Copeland, neither the arresting probation officers, or the assisting officers from Hurricane City knew of any "eminent threat to the life of [Defendant] at that point [on May 7]."[22]   While there was ample evidence that Defendant was a friend of Jensen,[23] there was no evidence that any of the three individuals involved in the March 24 incident (Aaron Barbosa, Lucinda Corral and Juan Gonzalez) were anywhere near Jensen's home on May 7.[24]   In addition, no evidence was presented at either hearing connecting Jensen (or anyone else who was present on May 7) to any of the individuals involved in the March 24

---

[20] Tr. 1 at 65-66.

[21] Tr. 1 at 67.

[22] Tr. 1 at 68.

[23] Tr. 1 at 67, 156.

[24] Tr. 1 at 68.

incident.  Further, Jensen was in no way connected with the March 24 incident at Defendant's home, and Defendant did not receive any threats on May 7.

Eventually, a federal grand jury returned an indictment against Defendant charging him with being a felon-in-possession of a firearm, in violation of 18 U.S.C. § 922(g)(1).

## DISCUSSION

The Defendant argues that one defense to the federal charge of felon in possession of a firearm is that of justification or necessity.[25]

To prove the affirmative defense, a defendant must prove each of the following elements of the *Vigil* Test by a preponderance of the evidence:

> (1) [he] was under an unlawful and present, *imminent*, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury;
> (2) [he] had not recklessly or negligently placed himself in a situation in which it was probable that he would be forced to choose the criminal conduct;
> (3) [he] had no reasonable, legal alternative to violating the law, a chance both to refuse to do the criminal act and also to avoid the threatened harm; and
> (4) that a direct causal relationship may be reasonably anticipated between the criminal action taken and the avoidance of the threatened harm.[26]

To prevail on such a defense, Defendant must show that the factors continued to exist at the time of possession of the firearm.[27]

---

[25] *United States v. Butler*, 485 F.3d 569 (10th Cir. 2007); *United States v. Gomez*, 92 F.3d 770 (9th Cir. 1996); *United States v. Newcomb*, 6 F.3d 1129 (6th Cir. 1993).

[26] *United States v. Butler*, 485 F.3d 569, 572 (10th Cir. 2007) (citing *United States v. Vigil*, 743 F.2d 751, 755 (10th Cir. 1984)(emphasis added).

[27] *Id.* (citing *United States v. Al-Rekabi*, 454 F.3d 1113, 1123 (10th Cir. 2006)).

Many federal courts have held that the defense may arise only in rare situations, and should be construed very narrowly.[28]  The Tenth Circuit Court of Appeals has stated that it "is extremely difficult for one to successfully raise the defense of necessity" to a felon-in-possession charge.[29]

The Government argues that "the Court should consider whether Defendant's possession of a firearm in his pants' pocket during an apparently innocuous visit to a friend's home fits within the "extraordinary circumstances" that give rise to a jury instruction for a necessity defense at trial."[30]  Under this theory, Defendant must successfully demonstrate evidence on each of the four elements enumerated in the *"Vigil* Test" before he may successfully raise the defense of duress or necessity.[31]

The court finds that Defendant fails to meet the requirements for the imminency element of the *Vigil* Test, and therefore cannot prevail on his application for a jury instruction of necessity.

---

[28] *See United States v. Paolello*, 951 F.2d 537, 542 (3rd Cir. 1991); *United States v. Deleveaux*, 205 F.3d 1292, 1297 (11th Cir. 2000) (agreeing with other circuits that such a defense is available "in only extraordinary circumstances").

[29] *Vigil*, 743 F.2d at 756.

[30] Memorandum in Opposition to Defendant's Second Supporting Memorandum Requesting a Jury Instruction for Justification, page 7.

[31] *See Butler*, 485 F.3d at 572 n.2 ("an affirmative defense consists of several elements and testimony supporting one element is insufficient to sustain it even if believed, [therefore] the trial court and jury need not be burdened with testimony supporting other elements of the defense"), *see also id.* at 576 (failure to proffer evidence on the first prong of the "*Vigil* test" is "sufficient to end the [legal analysis on] the matter.")

IMMINENCY

The Defendant argues that he is entitled to a defense of necessity because he faced an imminent threat.  He asks the Court to find imminency where he was attacked six weeks before the possession, and where his family testified that they received threats in the weeks following the attack. In order to meet the imminence element of the *Vigil* Test, required for a justification defense, Defendant must demonstrate a "present, imminent, and impending threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury."[32]

On March 24, 2007, Defendant was involved in a dispute with an associate to whom he had loaned money.  During the attack, Defendant shot one of his attackers.  Defendant was not charged in the killing.  In the weeks following the incident, Defendant's family kept in touch with local law enforcement in Hurricane, Utah, out of concern for Defendant's safety and their own.  Law enforcement conducted an investigation, but there is no evidence before the Court of any credible threat discovered by law enforcement so that Defendant should fear retaliation.

Though threatening phone calls were received by Defendant's ex-wife, Defendant was living some distance from her and his son, and no phone calls were ever received personally by Defendant.

The court finds these perceived threats do not justify Defendant's possession of a firearm nearly two months later in May.  On May 7, Defendant possessed a firearm as he walked up to a friend's (Ricky Wayne Jensen) home.  There is no evidence that anyone in Defendant's

---

[32] *Id.* at 572.

family was anywhere near the scene on that date.  Nor is there any evidence that they were specifically threatened on that day.  Therefore, the fact that Defendant's ex-wife and child may have felt threatened at some point after the March 24 incident does not show an immediate or imminent threat to Defendant while at Jensen's house.

Based on his family's discussions with police, Defendant argues that he and his family suspected that Barbosa, Corral and Gonzalez had gang affiliations.  However, testimony provided by law enforcement indicated that the Defendant's family were informed when the police discovered no gang affiliation and the unlikelihood of retaliation.[33]  The family's suspicions, even if true, do not create a credible imminent threat to Defendant on May 7.  There is no evidence that anyone directly involved with the March 24 incident were anywhere near Rick Wayne Jensen's house on May 7.

Defendant offers two cases from the Ninth Circuit Court of Appeals in support of his argument that he faced an imminent threat on May 7.  First, he cites to *United States v. Gomez*, 92 F.3d 770 (9th Cir. 1996).  In *Gomez*, the defendant acted as an informant for the government providing information about an individual who had sought him out to be a hit man while the two were incarcerated together.[34]  Sometime thereafter however, the defendant's identity became known to the public and he soon became quite unpopular with the criminal element– receiving a series of death threats.

---

[33] See FN17, supra.

[34] *Id.* at 772.

Fearing for his life, Gomez contacted the authorities and informed them of the detailed threats.  They were slow to help and did not provide him with any type of protection.[35] Having made several attempts to acquire protection through legal avenues, and fearing for his own life after receiving several death threats, Gomez decided to arm himself with a shotgun for protection.  A couple of days later, officers found Gomez in possession of the shotgun.  He was charged with and subsequently convicted of being a felon-in-possession of a firearm.

The Ninth Circuit overturned his conviction because "it was unlikely [that the one threatening the defendant] would cool off and lose interest in [the defendant]."[36]  The court of appeals added that the defendant "had already received numerous threats over an extended period of time" and the fact that "he hadn't been threatened in the last hour or the last day didn't mean the danger had abated."[37]  While the court did recognize Gomez's right to possess a firearm, it recognized that his case was unique.[38]

Defendant's case is distinguishable from the *Gomez* decision on a number of levels.  First, in *Gomez*, the defendant had been working with law enforcement as a confidential informant and was in contact with them for an extended period of time.[39]  In the present case, Defendant initially met with members of the Hurricane City Police Department, but after March

---

[35] *Id.*

[36] *Id*. at. 776.

[37] *Id.*

[38] *See Id.*  ("The unusual nature of the threat distinguishes this case from most felon-in-possession cases where a justification defense is raised").

[39] *Id.* at 773.

24, he had very little personal contact with police, until he was arrested on May 7.  Defendant did

not continue to follow up with any law enforcement to report any threats received by himself or

his family.  Secondly, in *Gomez*, the defendant's identity was mistakenly revealed, following

which, the threat increased.[40]  In Defendant's case, the threats diminished over time.  Next, law

enforcement did not specifically inform Gomez of his restricted status during the period of his

threats as was the case with Defendant.  Finally, Gomez exhausted all of his legal options before

arming himself, Defendant did not.

   Defendant also cites to a case involving a duress defense in *United States v.*

*Contento-Pachon* in support of his motion.[41]  The requirements for a duress defense include three

parts: (1) an immediate threat of death or serious bodily injury, (2) a well-grounded fear that the

threat will be carried out, and (3) no reasonable opportunity to escape the threatened harm.[42]

Sometimes a fourth element is required: the defendant must submit to proper authorities after

attaining a position of safety.  In *Contento-Pachon*, drug dealers threatened to harm the defendant

and his family if he did not smuggle illegal drugs into the United States.[43]  So, the defendant

smuggled the drugs into the country and was subsequently prosecuted and convicted for the

crime.  The Ninth Circuit Court of Appeals overturned the conviction holding that the defendant

---

[40] *Id.* at 773.

[41] 723 F.2d 691 (9th Cir. 1984).

[42] *United States v. Shapiro*, 669 F.2d 593, 596 (9th Cir. 1982).

[43] *Id.* at 693.

had legally made out a justification defense of duress because the particularized information of the threat tended to show credibility and imminence.[44]

*Contento-Pachon* is inapposite from Defendant's case.  First and most importantly, *Contento-Pachon* is a duress case, and accordingly, a different legal analysis applies. In *Contento-Pachon*, there was a specific threat that harm would befall the defendant if he did not smuggle illegal drugs into the country, and the threatening party put the defendant under duress to get him to perform the task.[45]

In the present case, Defendant was not threatened with his life or those of his family if he did not perform some task.  Instead, Defendant argues that some harm would have befallen him at some unknown point in the future if he did not possess the firearm.  The conditional language of *Contento-Pachon* is not present here.  Thus, the decision is unpersuasive.

Caselaw requires that evidence of a threat of serious injury or death is actually present, imminent and impending.[46]  While "difficult choices may emanate from federal firearms laws, which impose something approaching absolute liability" on persons restricted from possessing firearms, "it is one of the burdens of a felony conviction."[47]  Defendant seeks to have the Court conclude that imminency would exist for extended periods after an incident such as that occurred on March 24.  In this case, the Court cannot find there was imminency nearly six

---

[44] *Id.*

[45] *Id.*

[46] *Butler*, 485 F.3d at 575.

[47] *Id.* at 576.

weeks after the incident on a visit to a friend's home, with no credible threat apparent against the Defendant at that time.

### RECKLESS AND NEGLIGENT PLACEMENT

On May 7, by carrying a firearm on his visit to his friend's home, Defendant "recklessly or negligently placed himself in a situation in which it was probable that he would [choose criminal conduct]."[48]

To prevail on the second element of the *Vigil* Test, Defendant must show that his actions were not for the purpose of advancing a defense of necessity.[49]

Defendant argues that he did not recklessly or negligently place himself in danger because he did not seek out his assailants and moved into his parents home.  However, Defendant was in possession of a firearm on a cordial visit to his friend's home on May 7.  By arming himself on such a visit, Defendant voluntarily chose to engage in criminal conduct.

### REASONABLE, LEGAL ALTERNATIVE

The third element of the *Vigil*  requires that no "reasonable, legal alternative to violating the law," exists.[50]  The Tenth Circuit has explained the reasonable legal alternatives to breaking the law:

> The [defense] does not arise from a 'choice' of several sources of action; it is instead based on a real emergency. It may be asserted only by a defendant who was confronted with a crisis as a personal danger, a crisis that did not permit a selection from among several solutions, some of which would not have involved criminal acts." . . . . [U]nless the defendant demonstrates that he pursued his

---

[48] *United States v. Gant*, 691 F.2d at 1159, 1162 (5th Cir. 1982).

[49] *Id.*

[50] *Butler*, 485 F.3d at 572 (citing *Vigil*, 743 F.2d at 755).

alternatives or that they were foreclosed, he may not successfully raise the justification defenses.[51]

Here, Defendant argues that he had no legal alternative under Gomez, due to the fact that he could not leave the state and reside elsewhere because he was on probation, and because he made efforts to make himself unavailable to his assailants.[52]

The Government argues that when Defendant visited his friend's home on May 7, there was no real emergency.

During the routine search of his friend's home by probation officers, Defendant was found to be in possession of a firearm.  This situation did not constitute any threatening situation by itself or in connection with the March 24 incident, as the Defendant was searched by probation officers in their usual course of duty while visiting a friend at his home.

REASONABLE RELATIONSHIP

Finally, Defendant must show "that a direct causal relationship may be reasonably anticipated between the [criminal] action taken and the avoidance of the [threatened] harm."[53]

The Defendant offers the *Gomez* case in support of his claim that this causal relationship existed on May 7.  However, the defendant in that case was chased by a man wielding a gun and subjected to a series of threats.[54]

---

[51] *United States v. Lewis*, 628 F.2d 1276,1276 (10th Cir. 1980).

[52] *Id.* 92 F.3d 770.

[53] *Butler*, 485 F.3d at 572 (citing *Vigil*, 743 F.2d at 755).

[54] *Id.* 92. F.3d at 778.

14

As outlined above, the case at bar differs substantially from the situation described in Gomez.  In this case, on May 7 when the Defendant visited his friend's home, both he and his wife and child were far from any perceived threat.  Moreover, no evidence was presented at the evidentiary hearings indicating that Defendant was ever personally threatened with harm, and there is nothing to suggest that any threats were received near the date of May 7.

On May 7 at his friend's home, there was at best a remote possibility that someone associated with the March 24 incident may retaliate against the Defendant.  In this case, the Court does not find a causal relationship between some unknown possible future harm and the Defendant's possession of a firearm at his friend's home on May 7.

### NECESSARY TIME TO AVOID DANGER

One final consideration to be made by the Court is whether the Defendant possessed the firearm beyond a reasonable time to avoid danger.  Continued possession beyond the time that the emergency exists, on its own, will nullify an attempt at a necessity defense.[55] The defense of necessity can only be employed for possession during the time he is endangered- possession of a firearm for a significant period after is a violation.[56]  Courts have rejected the necessity defense on the ground that the defendant maintained possession of the firearm longer than absolutely necessary to abate the danger.[57]

The Defendant argues that his wife was subjected to a "series of threats," and in order to avoid any danger to himself or his family, he needed the firearm for protection.

---

[55] *United States v. Panter*, 688 F.2d 268, 272 (5th Cir. 1982).

[56] *Id.*

[57] *See Singleton*, 902 F.2d at 473; *Nolan*, 700 F.2d at 484-85.

In this case however, the Defendant was in possession of the gun nearly six weeks after the March 24 incident.  He had been warned not to carry a firearm by law enforcement.  The Defendant never specifically reported any articulable fear to law enforcement officers in the weeks following March 24, nor is there any evidence that any retaliation had actually been taken against Defendant.  At the time Defendant was found to be in possession of the firearm, the period of endangerment had long since lapsed.

CONCLUSION

As outlined in detail above, the Court finds Defendant has not met his burdens under the "Vigil Test."  Therefor his Motion for a Jury Instruction on Necessity should be denied.

16

### RECOMMENDATION

As outlined above, it is HEREBY RECOMMENDED that Defendant Dutton's motion for jury instruction for necessity be DENIED.

Copies of this report and recommendation are being mailed to all parties who are hereby notified of their right to object.  The parties must file any objection to the Report and Recommendation within ten days after receiving it.  Failure to object may constitute a waiver of objections upon subsequent review.

DATED this 26th day of March, 2008.

Brooke C. Wells
United States Magistrate Judge